DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,      )
                                   )
           Plaintiff,     )
                                   )      Civil No. 1984-104
          v.              )
                                   )
GOVERNMENT OF THE VIRGIN ISLANDS,   )
                                   )
           Defendant.    )
_____)

ATTORNEYS:

**Donald G. Frankel, AUSA**
Newton, MA
    *For the plaintiff.*

**Joycelyn Hewlett, AUSA**
St. Thomas, U.S.V.I.
    *For the plaintiff*.

**Vincent F. Frazer, AG**
**Elliott M. Davis, SG**
**Matthew Phelan, AAG**
St. Thomas, U.S.V.I.
    *For the defendant.*

<u>MEMORANDUM OPINION</u>

**GÓMEZ, C.J.**

    In March of 1984, the United States filed this action against the Government of the Virgin Islands (the "Virgin Islands"). The complaint alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*

    Virgin Islands waste water, including sewage, generally

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 2

undergoes a treatment process.  Waste water is pumped from sewage stations placed throughout the territory to Waste Water Treatment Plants ("WWTP").  There, the wastewater is treated. Following its treatment, treated sewage is discharged from the WWTP to receiving waters, in conformity with the requirements of a Territorial Pollutant Discharge Elimination System ("TPDES") permit.

The filing of the 1984 action arose when as a result of WWTP and pump station failures, the waste water treatment process was severely compromised.

In September of 1985, the U.S. and the Virgin Islands entered into a consent decree ("original decree") to resolve the claims in the complaint.  In 1991, the United States filed a motion seeking to hold the Virgin Islands in contempt for violating the original decree.  Resolution of that motion resulted in a 1995 amended consent decree ("amended decree"), which was entered by this Court on January 19, 1996.  That amended decree currently binds the parties.

The amended decree set forth several initiatives with the overarching objective being "to cause the Virgin Islands to come into and remain in compliance with the Territorial Pollutant Discharge Elimination System ("TPDES") permits (including without

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 3

limitation, requirements related to proper operation and
maintenance) as well as any renewals or modifications to such
permits applicable to the following waste water treatment plants
("WWTPs"): St. Croix WWTP, Charlotte Amalie WWTP aka "Airport
Lagoon", Nadir Estates WWTP, Vessup Bay WWTP, Brassview WWTP, Old
Tutu WWTP, New Tutu WWTP, Cruz Bay WWTP, Donoe WWTP, Bordeaux
WWTP, and the George Simmonds WWTP."

On March 10, 2003, the Court issued an Order regarding
repairs to several pump stations.  In that Order, the Court
extended a deadline for the repair of pumps at the Figtree pump
station to April 2003.  As to the LBJ pump station, the Court
ordered the Government to "[r]eplace or repair any Pumps that are
not operational so that all the house pumps are in full
operational condition at all times."

On August 20, 2008, the Virgin Islands filed a motion for
partial termination of the amended decree. The Court granted that
motion as to four WWTPs, Brassview, Vessup Bay, George Simmonds,
and Bordeaux, finding that these WWTPS fulfilled the criteria for
partial termination, pursuant to the terms of the amended decree.

On March 11, 2010, the United States filed an emergency
motion (the "emergency motion") which asserted that VIWMA had
dumped approximately 50 million gallons of raw sewage into the
Caribbean Sea. This discharge was the result of the failure of

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 4

house pumps at a pump station on St. Croix, the Figtree Pump

Station ("Figtree").  The United States estimated that without a

functioning pump, 300,000 to 500,000 gallons of raw sewage per

day was being bypassed[1].  The United States argued that such a

bypass was in violation of an amended decree entered into by this

Court on January 19, 1996, a March 10, 2003 Order by this Court,

and the CWA.  The United States requested a hearing on the

matter.

The Court held an evidentiary hearing on March 16, 2010 and

March 17, 2010.  During the course of the hearing, the Court

heard testimony from several witnesses: Pedro Modesto

("Modesto"), municipal programs specialist assigned to the water

programs with the Environmental Protection Agency, Earl Haase

("Haase"), director of wastewater at VIWMA, Steve Aubin

("Aubin"), chief operating officer of VIWMA, Orlando Ramirez

("Ramirez"), staff engineer at VIWMA, and May Adams-Cornwall

("Adams-Cornwall"), executive director of VIWMA. Testimony

established that in the days prior to the hearing, there were no

operational house pumps at Figtree.  Additionally, an auxiliary

diesel pump that had been used at Figtree had failed.

There was also testimony regarding multiple pump failures

at two other pump stations, the Cancryn and Barren Point pump

stations.  Near the end of the hearing, Adams-Cornwall testified

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 5

that she had been informed by VIWMA personnel that VIWMA had
repaired one house pump to operability.  She noted that the house
pump had resumed duty work at Figtree.

At the hearing, the United States moved pursuant to Federal
Rule of Civil Procedure 25(c) for the joinder of VIWMA as an
additional defendant. VIWMA and the Government did not oppose
such joiner.  The Court permitted joinder of VIWMA for the
purpose of its participation in the evidentiary hearing. The
Court ordered further briefing from the parties regarding a post-
judgment joinder of VIWMA to this litigation.

At the conclusion of the evidentiary hearing, the Court took
under advisement the broader contours of the CWA and Amended
Consent Decree issues raised in their motion.  To address the
urgent matter raised by the United States, the Court issued an
interim Order the terms of which were consented to by all
parties.  Among the requirements of that Order were that: (1) a
house pump that Cornwall testified was working at the Figtree
station on March 17, 2010, would be remain functional, (2) a
second house pump would be installed and operational at the
Figtree station no later than March 23, 2010, (3) VIWMA will
comply with the public notification requirements outlined in its
TPDES permit, (4) two backup diesel pumps would be available and
working on St. Croix within short order, the first pump by March

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 6

24, 2010 and the second by March 26, 2010, and (5) the Government would certify no later than March 23, 2010 that the backup diesel pumps at Cancryn were operational and in a ready condition, in the event that they needed to be used.

On March 24, 2010 VIWMA submitted a certification by Aubin that two house pumps were operable at the Figtree station. Furthermore, he certified that a standby diesel pump was operational at Figtree.  He also certified that the 6-inch and 4-inch diesel pumps at the Cancryn Pump Station were operable.

On June 16, 2010, VIWMA submitted a status report which detailed the operational status of pumps at the Figtree and Cancryn pump stations.  Two house pumps were operational at the Figtree pump station. VIWMA asserted that it was working with a vendor in Puerto Rico to repair the final house pump, and that VIWMA's governing board had approved the payment of the cost of repair.  VIWMA further noted that the diesel stand pump was operational, and VIWMA stated that when it received a part for a second diesel pump, VIWMA would be able to make that pump operational.

VIWMA indicated that its board had approved funds for the purchases of two additional house pumps and parts.  VIWMA stated that house pumps would be installed at the LBJ and Lagoon Street pump stations.  VIWMA also reported that it had moved forward

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 7

with installing a plug at Cancryn so that it could address house pump repairs there. VIWMA hired a contractor who installed a pipe plug to prevent sewage from interfering with repairs. As a result, VIWMA was able to repair one house pump to operability. It stated that it had removed another house pump, and that pump was under repair at the VIWMA machine shop.

## II. <u>DISCUSSION</u>

### A. **Motion for Joinder**

Rule 25 provides in pertinent part:

(c) Transfer of Interest.

If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party. The motion must be served as provided in Rule 25(a)(3).

Fed. R. Civ. P. 25(c). "One commentator has noted that '[t]he most significant feature of 25(c) is that it does not require that anything be done after an interest has been transferred." *Nat'l Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc.*, 2 F.3d 493 (3d Cir. 1993). Indeed "[j]oinder of the transferee is unnecessary unless the trial court makes a discretionary determination that the transferee's presence would facilitate the case." *Id.* "To determine whether an entity is a transferee of interest so as to trigger this discretion however, a district court's mission is one of applying law to facts." *Id.*

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 8

## B. Clean Water Act

"The Clean Water Act (CWA), as amended, 86 Stat. 816, 33 U.S.C. 1251 *et seq.*, established a National Pollution Discharge System (NPDES) that is designed to prevent harmful discharges into the Nation's waters." *Nat'l As'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650 (2007).  Section 301(a) of the CWA prohibits the discharge of any pollutant into the waters of the United States, except in the limited circumstances under which the CWA permits discharge.  Section 402 of the Act provides that "the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants . . . ." 33 U.S.C. § 1342(a).  "The Environmental Protection Agency (EPA) initially administers the NPDES permitting system for each State", but a State may receive authorization to have state or territorial officials oversee permitting. *Id.*  In the Virgin Islands, the Department of Environmental Protection and Natural Resources administers permits.  The framework for permit system for the authorized discharge of pollutants into the water of the Virgin Islands is enumerated at 12 V.I. Code Ann. tit. 12, § 185.

## C. Motion to Enforce Consent Decree

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 9

"It is settled that a court does have inherent power to enforce a consent decree in response to a party's non-compliance . . . ." *Holland v. N.J. Dep't of Corrections*, 246 F.3d 267, 270 (Cir. 2001).

"Although consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken." *Fox v. United States Dep't of Hous. and Urban Dev.*, 680 F.2d 315, 319 (3d Cir. 1982)(internal citations omitted). Moreover, "they are construed according to traditional precepts of contract construction[.]" *Id.* (citing *United States v. ITT Continental Bakery Co.*, 420 U.S. 223, 236-38 (1975)).

### III. <u>ANALYSIS</u>

### A. Motion for Joinder

The Court will first address whether VIWMA is a transferee of the Virgin Islands Public Works Department's interest in this matter.

In *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit discussed the transfer of an interest from one corporation to another. "A 'transfer of interest' in a corporate context occurs when one corporation becomes the successor to another by merger or other acquisition of the interest the

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 10

original corporate party had in the lawsuit." *Id.*

The Court must determine if VIWMA is a successor of the Government insofar as it has assumed waste water management responsibilities. [1]

In *Organic Cow, LLC v. Center for New England Dairy Compact Research*, 335 F.3d 66 (2d Cir. 2003), the Court of Appeals for the Second Circuit addressed the substitution of a purported successor of a compact established amongst six Northeastern states, Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont for the purpose of regulating prices. That compact was authorized by Congress in June 1996.[2]  Congress's authorization expired on September 30, 2001.

The Second Circuit outlined the normal course for the termination of the existence of a governmental agency:

> Generally, when a government agency, commission, or corporation expires, Congress (or the state legislature) appoints a successor in interest or establishes a method for identifying such a successor. *See, e.g., Chairman of U.S. Maritime Comm'n v. California Eastern Line, Inc.*, 204 F.2d 398, 399-400 (D.C. Cir. 1953)(noting that the United States Maritime

---

[1] The Court notes that the amended consent decree specifically addresses its applicability to successors of the parties to the decree. It provides that "[t]his Decree shall apply to and be binding upon the above named parties and upon their officers, agents, servants, employees, successors, assigns and attorneys." (Am. Consent Decree § 2.)

[2] Such authorization was essential in order for the entity to accord with the Compact Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 3 ("No state shall, without the Consent of Congress ... enter into any Agreement or Compact with another State . . . .").

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 11

Commission was abolished pursuant to the Reorganization
Act of 1949, which provided that pending actions
against the abolished agency could be maintained
against a successor to that agency, "or, if there be no
such successor, against such agency or officer as the
President shall designate"). In other cases, the
governmental unit responsible for creating the entity
is deemed the successor in interest.  *See e.g., United
States v. Koike*, 164 F.2d 155, 157 (9th Cir.
1947)(concluding that an action initiated by Price
Administrator on behalf of the United States does not
abate with the elimination of that office, but rather
falls to the United States, which is the real plaintiff
in interest).

. . .

We are not, of course, holding that the Compact must
itself identify a successor, or that a valid successor
cannot be a private entity. As noted above, when
Congress intends to transfer assets and liabilities of
an expiring federal entity, it often will do so by
statute. *See Defense Supplies Corp. v. Lawrence
Warehouse Co.,* 336 631 (1949) (interpreting legislation
which dissolved the Defense Supplies Corporation and
transferred its "assets and authority" to the
Reconstruction Finance Corporation).

*Organic Cow*, 335 F.3d at 72.

In 2004, the legislature passed Act 6638, creating the

entity VIWMA. The statutory framework for VIWMA was later

enumerated at 29 V.I.C. § 496 *et seq*. The stated purposes of

VIWMA are "to provide environmentally sound management for the

collection and disposal of solid waste, including operation and

closure of landfills, and wastewater collection, transport,

treatment and disposal in the Territory." *Id.* Furthermore, VIWMA

is authorized to "perform all of the functions consistent with

[chapter 8] heretofore vested in the Government of the Virgin

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 12

Islands and the Commissioner of Public Works[.]" *Id.*(r). VIWMA
thus seems to have been legislatively transferred the
responsibilities of the predecessor entity responsible for those
functions —— Public Works.  Though this was not a case as
discussed in *Organic Cows* of a predecessor entity "winding down,"
Act 6638 clearly contemplates that VIWMA will perform the
functions related to waste water management previously carried
out by the Government.

    With respect to the transfer of interest in the property
related to waste management, including the pump stations to
VIWMA, Act 6638 provides in pertinent part:

>       Upon passage of this Act, the Governor is authorized to
>       transfer, and the Legislature hereby consents to the
>       transfer of, possession and control of the facilities
>       and equipment, and real and personal property and
>       rights and interests of any kind related thereto
>       comprising the solid waste management and wastewater
>       systems currently under the jurisdiction of the
>       Department of Public Works and owned by the Government
>       of the Virgin Islands.

2004 V.I. Sess. Laws 6638.  VIWMA asserts that "while it is
correct that the VIWMA operates the Territory's wastewater system
pursuant to Legislative Act 6638, the properties and facilities
comprising the system have not been formally transferred to the
VIWMA."(Reply of VIWMA to Mot. of United States for an Order
Joining the Auth. as Party Def. in the Captioned Action, Pursuant

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 13

to Fed. R. Civ. P. 25(c) 1.).  VIWMA describes the transfer of
the Government's interest in assets as "an incomplete and
evolving" process. (*Id.* at 2.)  Nevertheless, VIWMA acknowledges
"that since the early part of 2005, the VIWMA has been the entity
which has assumed responsibility for the proper operation of the
sewer system as well as responsibility for adhering to the
performance and reporting requirements of the 1996 Amended
Consent Decree, to the exclusion of the Central Government." (*Id.*
at 2-3.)

In light of VIWMA's role in the waste management process, it
is clear that VIWMA's "presence would facilitate the case." The
Court thus finds its joinder in this action appropriate, and will
grant the government's motion to join VIWMA[3].

**B. Clean Water Act & Consent Decree**

**1. Figtree and LBJ Pump Stations**

The Figtree pump station is situated near the Hovensa Oil
Refinery in Figtree estate in the south central area of St Croix.
The LBJ pump station is located on the North Side of St. Croix.
When it is functioning, LBJ pumps about 1.3 million gallons of
sewage per day from the Christiansted area to Figtree.  Figtree

---

[3] The Court notes that Rule 25 requires that a motion to join a
transferee of interest "must be served as provided in Rule 25(a)(3)." At the
March 16, 2010 hearing, the government indicated that it had spoken to VIWMA,
and VIWMA had agreed to waive that service requirement. VIWMA was present at
that hearing and did not dispute such waiver.

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 14

pumps the LBJ sewage, as well as about 40,000 gallons of
additional sewage, to a wastewater treatment facility, the St.
Croix WWTP.  At the St. Croix WWTP, the sewage is treated.
Pursuant to a TPDES permit issued to VIWMA, VIWMA is authorized
to discharge treated sewage from the St. Croix WTTP via an
outfall into the ocean.

        Figtree has three Flowserve electric house pumps.  The
pumping burden at the Figtree station is evenly distributed.  The
pumps rotate, with one pump working at a time.  While one pump is
doing the  primary pumping, it is contemplated that the other two
pumps offer redundancy.

        In the Spring of 2008, two of the three house pumps at
Figtree were offering only sporadic operability.

        On or about January 17, 2010 the final operable house pump
at Figtree failed.

        Sometime shortly thereafter, VIWMA shipped one of the house
pumps to Florida for repair.  On January 26, 2010, VIWMA shipped
the other house pumps to Puerto Rico for repairs.

         In the absence of a working house pump, VIWMA employed an
auxiliary diesel fuel pump at the Figtree pump station.  The
auxiliary diesel pump is not capable of managing the full flow of
incoming waste water.  As such, when the auxiliary diesel fuel
pump is the pump doing duty work, there is an unauthorized

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 15

discharge, otherwise known as a "bypass," of approximately 200,
000 to 300,000 gallons of sewage a day.

In light of the hampered capability of the Figtree station,
on February 3, 2010, VIWMA elected to divert the approximately
1.3 million gallons of raw sewage normally pumped from LBJ to
Figtree through an approximately 1,600-foot outfall over Long
Reef, a reef on the northeast coast of St. Croix.  Modesto noted
that "[i]t is what we call the fielder's choice. If you do not
pump sewage over the reef out of LBJ, you're going to have a
situation all around Christiansted, downtown Christiansted.
You're going to have all the manholes spilling sewage right in
front of stores, restaurants, on the streets." (Hr'g Tr. Mar. 16,
2010 at 35.)

On or about February 16, 2010, the backup diesel pump at
Figtree failed.  If there is no working pump at the Figtree pump
station, the flow of sewage bypasses into the Figtree Gut, and
from there travels into Cane Garden.  Earl Haase described the
pathway the flow of sewage takes in the event of a total failure
at the Figtree pump station:

> THE COURT: Okay. But if there's no working
> pump, what is it that happens to the flow?
> THE WITNESS: It bypasses into Fig Tree Gut.
> THE COURT: Okay. When you say it bypasses
> into Fig Tree Gut, what does that mean?
> THE WITNESS: There is a manhole alongside Fig Tree Gut.
> When the wet well fills up, it overflows to
> the gut, that manhole.

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 16

     THE COURT: All right. And where does that
     manhole lead to?
     THE WITNESS: Down the gut, to the sea at Cane
     Garden Bay.

(*Id.* at 82-83.)     On February 16, 2010, there were two bypasses
of raw sewage: (1) the continuing bypass over Long Reef from LBJ
and (2) the bypass from Figtree into Cane Garden Bay.

     Thereafter, on February 26, 2010, the diesel pump being used
to pump sewage from LBJ to Long Reef suffered a mechanical
breakdown.  Consequently, the LBJ sewage could not be pumped over
Long Reef. In response, VIWMA activated a house pump at LBJ to
direct the LBJ sewage to Figtree. As the Figtree station was
still without a working pump, that sewage was bypassed along with
Figtree's flow of sewage, such that there was a bypass of about
1.7 million gallons of raw sewage a day at Figtree at that time.

     In total, it was estimated that the bypasses during the
period from January 16, 2010 to March 16, 2010 resulted in the
discharge of approximately 50 million gallons of untreated sewage
into the Caribbean Sea.

     The TPDES permit for the St. Croix WWTP authorizes VIWMA to
discharge treated sewage from that plant in conformity with the
conditions set forth in the permit.  With respect to discharges
at other sites, the permit provides in pertinent part that:

     (1) Bypass is prohibited and the Commissioner may take
     enforcement action against a Permittee for bypass,

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 17

unless:
(a) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;
(b) There was no feasible alternatives to the bypass, such as auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back up equipment should have been installed in the exercise of reasonable engineering judgement to prevent a bypass which occurred during normal periods of equipment downtime or maintenance; and
(c) The Permittee submitted notices as required under subsection 13.b.

(Ex. 3-Part 6, Aff. In Supp. Emergency Mot. to Enforce J. at 13.c.)  VIWMA and the United States differ on whether the bypass over Long Reef violated the permit.

The United States also asserts that VIWMA violated its TPDES permit by allowing several pumps at the Figtree, LBJ, Cancryn, and Barren Spot pump stations to fail without taking sufficient remedial efforts.  Specifically, the United States points to the TPDES' permits provision that "[t]he permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Permitee to achieve compliance with the conditions of this permit." (Ex. 3-Part 6, Aff. in Supp. Emergency Mot. to Enforce J.)

In *United States v. Municipality of Penn Hills*, 6 F. Supp.2d 432 (W.D. Pa. 1998), the District Court for the Western District

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 18

of Pennsylvania addressed a claim that the defendant municipality bypassed raw sewage into the Allegheny and Monongahela Rivers and their tributaries.  The United States brought an action, alleging that such discharge was in violation of the CWA and the National Pollutant Discharge Elimination System (NPDES) permits which Penn Hills held.  The government requested a preliminary injunction mandating that Penn Hills undertake activities to resolve the violations that posed pressing risks to human health.  The Court issued a preliminary injunction order, which dictated that Penn Hills address the unpermitted discharge points.

Thereafter, the government moved for summary judgment on its violation of CWA claims.  The violation of the CWA claims implicated the NPDES permits held by Penn Hills.  The NPDES permits contained a general prohibition against bypassing. Notwithstanding the prevailing rule against bypasses, the permits provided that except for the performance of necessary maintenance in certain circumstances,

> (2) . . . In all other situations bypassing is prohibited unless the following conditions are met:
>
> (a) A bypass is *unavoidable to prevent loss of life, personal injury or "severe property damage";* [and]
>
> (b) There are *no feasible alternatives to a bypass,* such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 19

> down-time. (This condition is not satisfied if the
> permittee could have installed adequate backup
> equipment to prevent a bypass which occurred
> during normal periods of equipment downtime or
> preventive maintenance) ....

*Municipality of Penn Hills*, 6 F.Supp.2d at 434 (quoting NPDES
permits, part (B)(1)(d)).

Penn Hills did not challenge the assertion that it had
discharged pollutants in quantities above the effluent limits
provided in the permit and/or bypassed untreated or partially
treated sewage through bypasses.  Nevertheless, it objected to
the characterization of any such discharge as unauthorized under
its NPDES permits.

Penn Hills' position was that the bypasses were authorized
because they "prevented hydraulic overloading, plant washouts
and/or property damage" and "that, prior to this litigation,
there were no feasible alternatives to the bypasses being used at
Penn Hills' plants." *Id.* at 436.

In response to the preliminary injunction Penn Hills built a
system of flow equalization tanks for holding excess sewage.  It
also established a comprehensive plan for directing raw sewage to
the Allegheny County Sanitary Authority for treatment.  The Court
found that these solutions represented "feasible alternatives" to
bypasses, reasoning that:

> Although Penn Hills contends that it was not authorized
> to take such actions prior to this Court's preliminary
> injunction order, Penn Hills neglects to mention the

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 20

> fact that, at any time, on its own initiative, it could
> have filed applications for and obtained authorization
> from the appropriate authorities for the rehabilitation
> and/or upgrading of its treatment plants. It did not do
> so.
>
> The Court recognizes that the measures taken by Penn
> Hills in this case to rehabilitate its sewage treatment
> system were indeed costly. Nevertheless, the Court
> finds that the above alternatives were feasible within
> the meaning of Penn Hills' NPDES permits.

*Id.* at 437.

The language of VIWMA's TPDES permit essentially mirrors the language of the NPDES permits in *Penn Hills*, with the additional inclusion of a notice requirement.  As in *Penn Hills*, the question with respect to the Figtree and Long Reef bypasses is whether a feasible alternative existed.

 VIWMA noted that maintaining a proverbial heir and a spare at pump stations has presented a challenge. VIWMA personnel testified that the territory has been marginalized by pump vendors because it is viewed by some as a small market.  Haase testified that being denied priority treatment by the vendor for the Flowserve pumps, Aqua Mechanics, led to significant delays in obtaining repair services.  Haase noted that "it was difficult to get [the Aqua Mechanic's vendor repair representative] to come to the island to examine those pumps that we felt had issues with repair service." (Hr'g Tr. Mar. 16, 2010 at 73.)

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 21

Another source of delay seemed to stem from inefficiencies in navigating the process that VIWMA has for the allocation of money to projects, known as the procurement process.  As part of that process, an invoice or estimate of the amount of money required for a project is presented to the board of directors of VIWMA.  They must vote to approve an expenditure before a check is issued.  Adams-Cornwall testified that she made a request to the board for approval of funds for a repair to one of the Figtree pumps in Spring 2009. She noted that the board approved that request in July 2009.  A check was issued for the repair in December 2009.  Cornwall was questioned about the lag time between the request for board approval and the issuance of a check for such repair:

> A. Occasionally, because of improper invoices and work load for the small staff, because I still consider us to be in transition, we don't have a lot of staff covering quite a bit of responsibility for this budget that we have, and this responsibility.
> So there are times when I think because of where it is in the queue, it doesn't move as quickly. And so to streamline that in the future, we're thinking about a system of alerts or flags that will allow the procurement staff, the finance staff, to be aware of the fact that these are compliance-related procurement issues.

(Hr'g Tr. Mar. 17, 2010 55-56.)

As in *Penn Hills*, VIWMA's ability to secure repairs and have in place two operable house pumps at Figtree on March 24, 2010, following the Court's March 17, 2010 interim Order, undercuts the

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 22

notion that undertaking repairs prior to that time was an
unfeasible alternative to the bypasses.

The Court does not discount the challenges that accompany
maintaining the pumps stations.  However, it cannot be the case
that complaints by the United States after the unauthorized
discharges of sewage into the Caribbean Sea, and the violation of
clearly defined orders from this Court, serve as the catalysts
for bringing operations at pump stations to an appropriate level.
The collapse of operations at Figtree could not reasonably be
said to be unexpected. Rather, as months passed with two failed
house pumps, the stability of Figtree's pumping system hinged on
the infallibility of the last standing house pump, which belonged
to a class of machinery that has, in the course of this
litigation, been all too fallible.  VIWMA could have undertaken
efforts to develop a systematic plan to address repairs to house
pumps when they malfunction.  It did not.  Moreover, when more
than one house pump is non-operational at a pump station designed
for the use of three pumps, there must be a time line for
restoring two house pumps to operation in short order.
Additionally, working diesel pumps must be readily at hand in the
event that such pumps are needed to be on duty service.

There are two other pump stations about which evidence was
presented at the March 16, 2010 and March 17, 2010 hearing with

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 23

questionable stability.

### 2. Cancryn Pump Station & Barren Spot Pump Station

The Cancryn pump station is formulated to have three functioning house pumps.  In December 2008, only one house pump was operational at Cancryn. In May 2009, all three of the house pumps were non-operational.  As of March 2010, it was still the case that none of the house pumps were operational.  A diesel pump-around pump was being relied upon to handle the approximately 2 million gallons of sewage that is pumped from the Cancryn Pump Station to the main wastewater treatment plant on St. Thomas Red Point WWTP. There were additionally a 6-inch pump and a 4-inch pump auxiliary diesel pumps in the pump station.

Testimony from Aubin and Adams-Cornwall established that faulty intake valves were inhibiting VIWMA's efforts to perform repairs.  When VIWMA attempted to repair the pumps, contractors encountered problems because the valves did not seal properly and released sewage which interfered with repairs.

In February of 2010, two house pumps at the Barren Spot pump station were non-operational.  In the midst of the struggle to maintain an operational diesel pump at LBJ, VIWMA moved the diesel backup from Barren Spot to LBJ to replace a failed diesel pump there.  However, after the diesel backup was employed at LBJ station, it failed.  The breakdown of a diesel backup on St.

Croix seems an all too frequent occurrence. Adams-Cornwall was questioned about the dismal performance of these diesel backups:

> Q. Okay. So is it fair to say that you have three backup diesel pumps on St. Croix, and all three have failed?
> A. Yeah. That would make you wonder.

(Hr'g Tr. Mar 17., 2010 at 65.) Adams-Cornwall testified that VIWMA would not purchase any more diesel pumps to service stations in St. Croix in the future.  She suggested that instead of purchasing additional diesel pumps, "[t]he pumps we're going to buy are just the electric house pumps for the inside . . . -- the house pumps." (*Id.* at 70.)

The evidence presented about the Cancryn and Barren Spot pump stations was troubling.  The inoperability of house pumps as well as the unreliability of back up pumps at these stations, positioned them on the precipice of a total failure in operation. It is imperative that VIWMA develop a procedure for addressing pump failures before operations devolve to the point where there is no backup.  If redundancy is not safeguarded at pump stations, unfortunately its seems, the options narrow to the type of "fielder's choice" about which Modesto testified.

## IV. <u>CONCLUSION</u>

The Court thus finds that the discharges at Figtree and Long Reef were not authorized under VIWMA's TPDES permit for the St.

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 25

Croix WWTP. That failure to abide by its TPDES permit is a breach of the amended consent decree and is also obviously a departure from the CWA-authorized discharge in its permit.  That finding is disturbing for several reasons.

One of the most precious and visible natural resources that the Virgin Islands possesses is its territorial waters.  Beyond their aesthetic appeal, the waters serve as a source of great entertainment, recreation, and food.  They also serve as the economic backbone for those whose livelihoods are sustained by its bounty.  They are also extremely vulnerable.

Given their important, yet vulnerable position, protection of these waters and the well-being of so many who come in contact with them would seem to be a concern of the Government.  That concern is hard to appreciate when the very entity that should serve as a protector is responsible for pumping the staggering amount of 50 million gallons of raw sewage into the Caribbean Sea.  Adding insult to that injury is the fact that the bypass discussed herein occurred without notice to the affected public.

It is equally hard to appreciate when the bypass of raw sewage seems avoidable with some degree of planning.

The Court is aware of other entities that have been sanctioned for discharging lesser volumes of pollutants into these waters.  Remarkably, the discharge in this case, which

*United States v. Gov't of the Virgin Islands*
Civil No. 1984-104
Memorandum Opinion
Page 26

exponentially exceeds any other, was undertaken deliberately, unabated and in some instances without giving notice by the very entity empowered to seek punitive measures against any other person or private entity undertaking such acts.  Indeed, the substantive correction action only commenced *after* detection and complaint by the EPA.  That model is not ideal.

The Court is mindful of the challenges that attend maintaining pump stations.  Indeed, the Court in not insensitive to the economic pressures, nor the logistical difficulties that may complicate efforts to repair pumps.  Still, given the significant value of the territorial waters, coupled with the threat to human health, a more comprehensive approach is needed to remedy the violation here and to prevent such future occurrences.

The Amended Consent Decree will be amended accordingly.  An appropriate Order follows.